BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: GATEWAY VIDEO GAME ADDICTION PRODUCT LIABILITY LITIGATION | MDL No.: _____ |

**MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER ACTIONS
FOR COORDINATED OR CONSOLIDATED PRETRIAL
PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, Movant-Plaintiff Rochelle Tomlin, as parent and natural guardian of M.B., a minor, respectfully requests the Judicial Panel on Multidistrict Litigation ("Panel") transfer the actions identified on the Schedule of Actions, and subsequently filed tag-along actions, to the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings.

**INTRODUCTION**

This litigation targets three discreet video game products manufactured by four Defendants. Each of these products is specifically marketed to children in much the same way, and they work synergistically as gateways to video game addiction in minors across the country by using features that target highly susceptible pleasure receptors in the developing brain. These three gateway games and their respective manufacturers are: *Fortnite,* manufactured by Epic Games, Inc. ("Epic"); *Roblox,* manufactured by Roblox Corporation ("Roblox Corp."); and *Minecraft,* manufactured by Microsoft Corporation ("Microsoft Corp.") and its wholly-owned subsidiary Mojang AB ("Mojang").[1] Each Defendant's profits are directly tied to the amount of

---

[1] Plaintiffs have also brought claims against Microsoft related to its Xbox console product, upon which the *Minecraft* video game product can be played. As set forth in the identified actions, Microsoft could have prevented Plaintiffs' alleged injuries through changes made to either its game or console product.

hours individuals play their child-focused games, *i.e.*, the more time a user plays their game, the more likely it is that the user will make an in-game purchase. To increase their profits, each Defendant designed their games with the assistance of child developmental experts and/or psychologists to include similar combinations of psychological conditioning techniques through algorithms, coding, and programming that manipulate minors' developing brains and rewire them to want to play at ever increasing, compulsive, and disordered rates. Defendants' actions were extremely successful and generated billions of dollars in revenue at a significant cost – innumerable children[2] suffering from video game addiction[3] that manifests in physical, psychological, and/or economic injuries that may include, but are not limited to, self-harm, emotional lability, depression, anxiety, impaired academic performance, diminished social interactions, and the need for medical and/or psychological treatment.

This considerable cost to countless children was wholly expected and predictable. For decades, scientists have studied video game addiction and found that prolonged use of video games can result in brain damage, cognitive decline, and physical and emotional deficits. Nonetheless, each Defendant prioritized their profits over the safety of the vulnerable children to which they marketed their products. Each Plaintiff in the identified actions started online gaming as a minor with one or more of Defendants' video game products and, as a result, suffered significant injuries related to video game addiction. Through this litigation, Plaintiffs seek to hold Defendants liable

---

[2] Researchers estimate that roughly 50 million children between the ages of 8-18 in the United States play video games, of which roughly 1.5% or 750,000 meet the clinical definition of Internet Gaming Disorder ("IGD") in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V-TR"). *See* Petry, Nancy, *Pause and Reset: A Parent's Guide to Preventing and Overcoming Problems with Gaming* (2019), pp.17-18.

[3] The DSM-V-TR notes that Internet Gaming Disorder ("IGD") – informally known as video game addiction – is the "[p]ersistent and recurrent use of the Internet to engage in games . . . leading to clinically significant impairment or distress . . ." including, but not limited to, depression, anxiety, cognitive impairment, self-injurious behaviors and suicidal thoughts and behaviors.

for their conduct based on legal theories sounding in, *inter alia,* product liability, negligence, and/or fraud/misrepresentation.

While this is not the first motion to transfer this Panel has considered related to video game addiction, this petition is materially different in both substance and scope than its 2024 predecessor. In 2024, this Panel was asked by different movants to create an <u>industry-wide</u> MDL centered on an alleged conspiracy among more than 30 defendants – many of which did not design, develop or manufacture the products at issue – to create addictive video games. *See In re Video Game Addiction Prods. Liab. Litig.,* 737 F. Supp. 3d 1353 (2024). On June 5, 2024, this Panel declined that motion, holding that the included actions lacked common factual questions because each complaint alleged a conspiracy between unique combinations of video game defendants based upon myriad games played by each plaintiff. *Id.* at 1354.

This proposed MDL is wholly distinguishable from that requested by the petitioners in 2024. Here, Movant-Plaintiff does not seek an industry-wide MDL. Rather, she requests consolidated proceedings limited to three gateway video games and their four manufacturers that specifically target children, employ similar unreasonably dangerous design features, and cause a common harm – addiction. Furthermore, unlike *In re Video Game Addiction Prods. Liab. Litig.,* Movant-Plaintiff does not assert a conspiracy between or among the Defendants, let alone all possible participants in the market for video game products. Instead, each Defendant is an independent actor with independent liability for their product's role in causing each Plaintiff's addiction. While the liability is distinct, the products act synergistically so that their combined effect and the attendant harm is greater. The present Motion and presented facts are therefore far more analogous to those in *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.,* 637 F. Supp. 3d 1377 (2022).

In *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.,* the Panel held that transfer and consolidation was proper in cases alleging adolescent social-media addiction caused by four independent social media products owned or manufactured by competing defendants. 637 F. Supp. 3d 1377 (2022). In its Order, the Panel recognized that centralization of claims involving similar products made by different manufacturers is appropriate when there are overlapping issues of general causation and common defenses that would be asserted by all defendants. *Id.* at 1378. The Panel's reasoning is directly applicable here.

As set forth in further detail below, each video game is similarly designed to employ related algorithms, programming, and coding that psychologically condition children to compulsively and addictively use these products. Accordingly, there will be significant overlap in fact and expert discovery on issues that include product liability, industry standards, game design processes, intellectual property, and general causation. There is also overlap in the defenses each Defendant will raise.[4]

Transfer and consolidation of these Actions will efficiently and conveniently allow one court to be presented with and resolve these and other common questions of fact and law, while avoiding the unnecessary burdens and costs of duplicative discovery and the risk of inconsistent pretrial rulings. For these reasons, Movant-Plaintiff requests that the Panel transfer these actions to one district – the Eastern District of Pennsylvania – for coordinated or consolidated pretrial proceedings.

---

[4] Indeed, in coordinated proceedings in the state of California against these same Defendants, Epic, Roblox Corp., Microsoft, and Mojang have represented their intent to move to dismiss based, in part, on legal defenses such as the First Amendment and/or Section 230 of the Communications Decency Act. Likewise, all four Defendants have represented their intent to move to compel arbitration in every case. These motions to compel arbitration will raise common legal questions such as if or when minors can be contractually bound to Defendants' End User License Agreements / Terms of Service.

4

## RELEVANT PROCEDURAL BACKGROUND

**Pending Actions.** At the time of this filing, there are 17 pending actions filed by 18 firms in seven jurisdictions, before 10 judges in five states. These actions contain nearly identical factual allegations and legal claims against Defendants.

**Plaintiffs.** Plaintiffs are individuals who, as minors, were exposed to one or more of Defendants' gateway video game products and, as a result of Defendants' exploitive actions and the defective nature of their products, became addicted to video games and suffered significant injuries.

**Defendants.** Defendant Epic Games, Inc. is a Maryland corporation, with its principal place of business in North Carolina. Epic designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video game product *Fortnite,* either directly or indirectly, to consumers across the United States.

Defendant Roblox Corporation is a Nevada corporation with its principal place of business in California. Roblox Corp. designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video game product *Roblox,* either directly or indirectly, to consumers across the United States.

Defendant Microsoft Corporation is a Washington corporation with its principal place of business in Washington. Defendant Mojang AB is a Swedish company with its principal place of business in Sweden. In 2014, Microsoft purchased Mojang for $2.5 billion. Accordingly, Mojang is now a wholly owned subsidiary of Microsoft. Mojang originally developed the video game product *Minecraft;* however, following Microsoft's 2014 acquisition of Mojang, both Microsoft and Mojang have been directly and actively involved in the design, development, testing,

assembly, manufacturing, publishing, packaging, labeling, preparation, distribution, marketing, supply, and/or sale of *Minecraft,* either directly or indirectly, to consumers across the United States.

**Status of Actions.** The cases identified in the Schedule of Actions are in their infancy. Neither discovery nor substantive motion practice has begun in any of the included Actions.[5]

**Status of Relevant State Court Litigation.** In California Superior Court, the Honorable Lawrence P. Riff, Superior Court Judge for the County of Los Angeles, presides over JCCP No. 5363, *Video Game Addiction Cases,* that coordinates gateway video game addiction claims involving *Fortnite, Roblox,* and *Minecraft,* their manufacturers, and three other defendants.[6] When deciding to coordinate these cases, the Los Angeles County Superior Court held that coordinating such actions was appropriate because, *inter alia,* the cases share common questions of fact or law and coordination would be convenient for the parties, witnesses, and counsel and serve judicial efficiency. *See* Ex. A - April 11, 2025 JCCP Coordination Order. The Court likewise held that coordinated proceedings would reduce the likelihood of inconsistent rulings on common factual and legal questions such as causation, the appropriateness of arbitration, and the merits of anti-SLAPP motions. *Id.*

JCCP 5363 presently consists of 26 cases. Judge Riff recently established a coordinated briefing schedule for Motions to Compel Arbitration, Anti-SLAPP Motions, and Demurrers (motions to dismiss). Ex. B - Sept. 10, 2025 Omnibus Order. Indeed, to efficiently address the

---

[5] The claims against Epic, Roblox Corp., Microsoft, and Mojang in the actions at issue in *In re Video Game Addiction Prods. Liab. Litig.,* 737 F. Supp. 3d 1353 (2024) have all been dismissed or stayed pending arbitration.

[6] JCCP 5363 includes claims against Apple, Inc., Google LLC, and Sony Interactive Entertainment LLC. None of these companies manufacture the gateway video game products *Fortnite, Roblox,* or *Minecraft.* Movant-Plaintiffs have not named these companies in any of the identified actions and are not requesting that claims against them be consolidated into the MDL sought by this Motion. To the contrary, Movant-Plaintiffs submit that the scope of this proposed MDL should be limited solely to those defendants who directly designed and manufactured the gateway video game products at issue.

6

question of arbitrability, on September 10, 2025, Judge Riff selected six cases to serve as "bellwether" cases for motions to compel arbitration, in which full briefing and, if necessary, arbitration-related discovery will proceed. Pursuant to Judge Riff's coordinated schedule, briefing on these motions and arbitration-related discovery will begin in November 2025 and continue through February 2026.

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 1407, the transfer of actions to a single jurisdiction for coordinated or consolidated pretrial proceedings is appropriate when the civil actions pending in various jurisdictions involve one or more common questions of fact, and transfer and consolidation will serve "the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). As this Panel consistently recognizes, centralization is appropriate when there are overlapping issues of general causation and common defenses, such that coordinating or consolidating proceedings would "eliminate duplicative discovery; avoid inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." *In re Heparin Prods. Liab. Litig.,* 559 F. Supp. 2d 1403, 1404 (J.P.M.L. 2008); *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig,* 637 F. Supp. 3d 1377, 1378 (2022).

## ARGUMENT

**I. TRANSFER OF THE ACTIONS TO ONE COURT FOR CONSOLIDATED OR COORDINATED PRE-TRIAL PROCEEDINGS IS APPROPRIATE PURSUANT TO 28 U.S.C. § 1407.**

Movant-Plaintiff respectfully submits that the identified actions should be transferred and consolidated before one district for pretrial proceedings because they share numerous overlapping questions of fact and law. Centralizing these cases before one district will avoid duplicative

discovery and conflicting pretrial rulings, while conserving the resources of the judiciary and all parties to this litigation.

      **A.**      **These Actions Share Numerous Common Questions of Fact and Law.**

This Panel routinely finds that actions involving similar products manufactured by different defendants are appropriate for consolidation when such actions share common factual questions and overlapping legal issues. *See, e.g., In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig,* 637 F. Supp. 3d at 1378 (transfer of actions involving similar social media products made by multiple manufacturers was appropriate in light of common questions of fact and the likely assertion of common legal defenses by all defendants); *In re AndroGel Prods. Liab. Litig.,* 24 F. Supp. 3d 1378, 1378-1380 (J.P.M.L. 2014) (later known as "*In re Testosterone Replacement Therapy Prods. Liab. Litig.*", MDL 2545) (transferring actions involving multiple testosterone replacement therapy products manufactured by different defendants, despite the products' differing forms of administration and formulations, because the actions shared common questions of causation and background science); *In re Glucagon-Like Peptide-1 Receptor Agonists GLP-1 Ras Prods. Liab. Litig.,* 717 F. Supp. 3d 1370, 1373 (2024) (transferring actions involving similar prescription drugs manufactured by different defendants was appropriate in light of common factual issues); *In re Hair Relaxer Mktg., Sales Pracs., & Prods. Liab. Litig.,* 655 F. Supp. 3d 1374, 1376 (J.P.M.L. 2023) (centralizing actions involving similar products manufactured by competing defendants); *In re Fluoroquinolone Prods. Liab. Litig.,* 122 F. Supp. 3d 1378, 1380 (J.P.M.L. 2015) (transfer of actions involving similar products made by multiple manufacturers appropriate in light of common factual questions and legal issues that are more justly and efficiently addressed by the transferee judge, "in contrast to allowing them to proceed separately in dozens of different districts."); *In re Acetaminophen – ASD/ADHD Prods. Liab. Litig.,* 637 F.

Supp. 3d 1372, 1375 (J.P.M.L. 2022) (transfer of actions involving similar products made by multiple manufacturers appropriate because of "significant overlap in central factual issues, parties, and claims . . . [and a] single MDL is the most appropriate vehicle for resolving defendants' common defenses[.]") Here, the factual allegations raised in each action against each Defendant are extremely similar, giving rise to common questions of fact and law.

In each action, Plaintiffs began playing online video games as minors using *Fortnite, Roblox,* and/or *Minecraft*. As a result of their use of *Fortnite, Roblox,* and/or *Minecraft,* Plaintiffs developed video game addiction and suffered significant injuries. Plaintiffs allege that *Fortnite, Roblox,* and *Minecraft* are similarly defective – each is unreasonably dangerous as a result of inadequate warnings and designs that include psychological conditioning through, *e.g.,* addictive coding, algorithms, and programming that is intended to increase the time users spend engaged with the video game products. Plaintiffs allege that each Defendant engaged in similarly tortious conduct, each having employed analogous psychologically manipulative schemes using different combinations of coding, algorithms, and programming in order to maximize engagement and increase profits. Plaintiffs further allege that despite each Defendant's knowledge that their product was harmful to minors, Defendants represented that their products were safe and failed to provide adequate warnings or offer safety features that would have avoided or mitigated harm.

In light of these shared factual allegations, each action will involve common factual questions that will be addressed through overlapping fact and expert discovery. Those common factual questions include, but are not limited to:

- Whether each Defendant knew that prolonged use of video games, including their own video game product, was harmful to minors;

- What are the industry standards related to the design of video games marketed to children;

- How can psychological conditioning lead to addiction;

- What is video game addiction;

- How does video game addiction manifest in children;

- How did each Defendant design their game;

- What psychological conditioning techniques, including programming, coding, and algorithms, were utilized in each Defendant's game;

- Whether the psychological schemes employed in *Fortnite, Roblox,* and *Minecraft* cause video game addiction;

- Whether Defendants intentionally designed *Fortnite, Roblox,* and *Minecraft* to include psychological conditioning in order to increase user engagement;

- Whether Defendants failed to adequately warn of the risks of addictive/prolonged use of their products;

- Whether Defendants failed to offer safety features that, if utilized, would have avoided or mitigated Plaintiffs' injuries;

- Whether Defendants' representations about the safety of their games were false;

- Whether Defendants track the number of hours individuals spend using their products;

- Whether Defendants are aware of or verify the identity and age of the users of their products;

- How Defendants present their End User License Agreements or Terms of Service to users; and

- Whether Defendants can verify the identity and age of individuals they claim have agreed to End User License Agreements or Terms of Service.

These common factual allegations and questions give rise to common legal questions, including:

- Whether Defendant's actions and business decisions were negligent;

- Whether *Fortnite, Roblox,* and *Minecraft* are considered "products" subject to product liability laws;

- Whether the addictive coding, algorithms, and programming employed in each Defendant's game is subject to First Amendment protections;

- Whether any of Plaintiffs' claims are barred by Section 230 of the Communications Decency Act; and

- Whether minor-Plaintiffs are bound by Defendants' End User License Agreements and/or Terms of Service.

Any slight differences that may exist in each individual case are significantly outweighed by the number of common factual and legal issues in these actions. As repeatedly recognized by this Panel, the presence of case-specific factual and legal issues does not negate the efficiencies of resolving numerous common questions through centralized proceedings. *See*, *e.g., In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig,* 637 F. Supp. 3d at 1378 ("[t]hat individualized factual issues may arise in each action does not – especially at this early stage of litigation – negate the efficiencies to be gained by centralization."); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F. Supp. 3d 1391, 1395 (J.P.M.L. 2018) (Centralizing class actions, personal injury claims, and government actions against multiple manufacturers of similar products in light of numerous common questions of fact and significant overlapping discovery, recognizing

11

that "[t]o the extent the actions entail unique factual or legal issues, the transferee court has the discretion to address those issues through the use of appropriate pretrial devices, such as separate tracks for discovery and motion practice."); *In re Fluoroquinolone Prods. Liab. Litig.,* 122 F. Supp. 3d at 1379 ("There are undoubtedly individualized factual issues presented by these actions, but after careful review of the record, we have determined that those considerations do not outweigh the benefits of centralization."); *In re Acetaminophen – ASD/ADHD Prods. Liab. Litig.,* 637 F. Supp. 3d at 1375 (". . . Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and a presence of additional facts is not significant where the actions arise from a common factual core."); *In re Oxycontin Antitrust Litig.,* 542 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008) ("the presence of additional or different legal theories is not significant when the actions still arise from a common factual core[.]") Here, the differences between the actions are minimal and centralization will allow for the efficient resolution of the numerous aforementioned common issues of fact and law. Accordingly, transfer and consolidation is appropriate under 28 U.S.C. § 1407 and this Panel's precedent.

> **B.      Centralization Will Avoid Duplicative Discovery, Conflicting Pretrial Rulings, and the Waste of Judicial and Party Resources.**

When there is significant overlap in the factual and legal questions presented in identified actions, this Panel consistently recognizes that centralization will serve "the convenience of the parties and witnesses and . . . promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). *See, e.g., In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig,* 637 F. Supp. 3d at 1378 (in light of common questions, "[c]entralization will eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel, and the judiciary."); *In re Zyprexa Prods Liab. Litig.,* 314 F. Supp. 2d 1380, 1382 (J.P.M.L. 2004) ("[T]ransfer under Section 1407 will offer the benefit of placing all actions in this docket before a single judge who can

structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected discovery demands that duplicate activity[.]"); *In re Acetaminophen – ASD/ADHD Prods. Liab. Litig.,* 637 F. Supp. 3d at 1375 ("A single MDL is the most appropriate vehicle for resolving defendants' common defenses . . ., in addition to discovery of common suppliers, regulatory agencies, and other third parties.") The same is true here.

As described above, all of the identified actions share numerous common questions of fact and law. Accordingly, the discovery Plaintiffs seek from Defendants and develop through experts will largely repeat from case to case. Centralization will therefore allow for streamlined interrogatories, requests for production, depositions, discovery conferences, and – if necessary – motions to compel. Likewise, centralization will allow for the uniform development and presentation of expert witnesses on common factual issues such as game design, video game addiction, child brain development, and general causation. Coordinating factual and expert discovery before one court will save each party and the myriad courts that would otherwise oversee these cases substantial resources.

Moreover, and perhaps most importantly, centralization will avoid duplicative motion practice and conflicting pretrial rulings. As set forth above, in the California state court coordinated *Video Game Addiction Cases* (JCCP No. 5363), Epic, Roblox Corp., Microsoft, and Mojang will soon file motions to compel arbitration and motions to dismiss that will raise common legal questions, such as the applicability of First Amendment protections and Section 230 of the Communications Decency Act, whether video games are "products," and whether young children can be bound to Defendants' End User License Agreements / Terms of Service. These same questions will arise in each federal action before this Panel. If the actions identified in the Schedule

of Actions are not consolidated, within months at least 10 federal judges in 7 jurisdictions will be asked to address nearly identical factual and legal questions. This would result in both a waste of resources for the judiciary and the parties and an imminent risk of conflicting rulings that, instead of bringing clarity to common legal issues and further efforts at resolution, would create legal uncertainty. *See In re Nat'l Prescription Opiate Litig.,* 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) ("allowing the various cases to proceed independently across myriad districts raises a significant risk of inconsistent rulings and inefficient pretrial proceedings.") Such risk of waste, inefficiency, and conflicting rulings can only be ameliorated through transfer and consolidation before one district.

      Informal coordination of these matters is not a practical alternative. As noted above, the 17 included actions involve 18 law firms, and 10 federal judges, in seven districts, in five states. Attempts at informal coordination cannot avoid each matter proceeding separately on its own schedule and subject to unique discovery orders. Accordingly, when discovery begins the scope of what is discoverable, how it is produced, and how such discovery may be used will necessarily differ from case to case. Furthermore, in the case of depositions, it would be extremely difficult for this many attorneys to coordinate the date, time, scope, and location for deposing any common witnesses. In stark contrast to such inefficient and wasteful individualized proceedings, "a single court can more effectively manage the discovery disputes . . . likely to arise, including those relating to discovery from third party witnesses, depositions of apex witnesses, and the scope of relevant discovery, generally." *In re Ahern Rentals, Inc.,* 481 F. Supp. 3d 1355, 1356 (J.P.M.L. 2020); *see In re Acetaminophen – ASD/ADHD Prods. Liab. Litig.,* 637 F. Supp. 3d at 1376 ("[I]nformal coordination appears insufficient to address the risk of inconsistent rulings on core discovery issues, preemption, and general causation."); *In re Uber Tech., Inc., Data Breach Litig.,*

304 F. Supp. 3d 1351, 1354 (J.P.M.L. 2018) ("[T]he number of actions, districts, and involved counsel, and the complexity of the litigation, make effective coordination on an informal basis impracticable."); *In re Viagra,* 224 F. Supp. 3d 1330, 1331 (J.P.M.L. 2016) ("[t]he number of involved districts . . . pose[s] [a] significant obstacle[] to informal coordination.") For these reasons, centralizing these actions is appropriate under 28 U.S.C. § 1407, as it will serve the convenience of the parties and witnesses, eliminate duplicative discovery and the waste of resources, and avoid conflicting rulings on common questions of fact and law.

## II.  The Actions Should Be Transferred to the Eastern District of Pennsylvania for Consolidated or Coordinated Pre-Trial Proceedings.

When selecting a transferee forum, this Panel considers multiple factors that include whether the forum "has a related action pending on its docket," "is convenient to the parties," "is not overtaxed with other MDL cases," and "has a judge with some degree of expertise in handling the issues presented[.]" Manual for Complex Litig. (4th) § 22.33. Each of these factors weigh strongly in favor of the Eastern District of Pennsylvania.

### A.  The Eastern District of Pennsylvania is a Logical, Convenient, and Efficient Forum for this MDL.

The Eastern District of Pennsylvania has several related actions pending on its docket. At the time of this filing, there are six cases filed in the Eastern District of Pennsylvania. Each of these cases has been assigned to or is likely to be transferred to Judge Mia Roberts Perez. It is anticipated that many more cases will soon be filed in this District.

The Eastern District of Pennsylvania is conveniently accessible to all parties[7] and likely witnesses. Philadelphia is a major city with a large airport that is serviced by all major domestic

---

[7] Each Defendant is also subject to general personal jurisdiction in Pennsylvania. *See Mallory v. Norfolk Southern Ry.,* 600 U.S. 122, 146 (2023).

15

carriers and offers close to 440 daily departures.[8] A train network also easily connects Philadelphia to many cities on the East Coast.

The Eastern District of Pennsylvania is well versed in handling complex MDLs and is not overly burdened with cases. *See, e.g., In re: Avandia Marketing, Sales Practices and Prods. Liab. Litig.* (MDL 1871).[9] At present, the District has five MDLs with pending actions – only two of which include more than 500 cases.[10] With 22 District Court Judges, the District is efficient in managing its case load. As of June 30, 2025, the median civil case was resolved within 5.1 months of filing.[11] The median civil case that went to trial did so within 24.3 months.[12] Accordingly, the Eastern District of Pennsylvania is an ideal forum for these consolidated proceedings.

### B. Judge Mia Roberts Perez of the Eastern District of Pennsylvania is Well-Positioned to Efficiently Adjudicate these Centralized Proceedings.

If the Panel chooses the Eastern District of Pennsylvania, Movant-Plaintiff requests that it appoint Judge Mia Roberts Perez to preside over this MDL. Each of the identified actions pending in the Eastern District of Pennsylvania has been assigned to, or is likely to be transferred to, Judge Perez. Although this would be Judge Perez's first MDL, she is well suited for this appointment based upon her experience as a practitioner and jurist. Judge Perez has considerable trial experience, both as a lawyer and a judge. Prior to joining the bench, Judge Perez tried

---

[8] https://www.phl.org/about/about-us

[9] U.S. J.P.M.L., MDL Statistic Report – Distribution of Pending MDLs by District at 3-4 (Sept. 2, 2025), available at https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_ By_District-September-2-2025.pdf (last visited Sept. 10, 2025).

[10] *Id.*

[11] U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics (June 30, 2025) at 16, available at
https://www.uscourts.gov/sites/default/files/document/fcms_na_ distprofile0630.2025.pdf (last visited Sept. 11, 2025).

[12] *Id.*

approximately 1,000 cases to verdict or final decision.[13] In 2016, Judge Perez was elected to serve as judge on the Philadelphia County Court of Common Pleas. As a Common Pleas judge, she presided over approximately 1,850 cases, of which 400 went to trial.[14] Judge Perez was confirmed as District Court Judge for the Eastern District of Pennsylvania in 2022. Relevant to this litigation, Judge Perez has adjudicated cases involving product liability claims, alleged corporate malfeasance, and legal issues such as arbitrability and the scope of constitutional protections. Judge Perez's judicial record and extensive history of managing cases up to and through trial make her an excellent choice to lead this MDL.

## CONCLUSION

For the foregoing reasons, Movant-Plaintiff respectfully requests that this Panel transfer the actions identified in the Schedule of Actions, and subsequently filed tag along actions, to Judge Mia Roberts Perez of the Eastern District of Pennsylvania for coordinated or consolidated proceedings.

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

M. Elizabeth Graham
Adam J. Gomez
123 Justison Street, 7th Floor
Wilmington, DE 19801
Phone: (302) 622-7000, Fax: (302) 622-7100
egraham@gelaw.com
agomez@gelaw.com

*Counsel for Movant-Plaintiff Rochelle Tomlin, as parent and natural guardian of M.B., a minor.*

---

[13] U.S. Senate Committee on the Judiciary – Questionnaire for Judicial Nominees at 36, available at https://www.judiciary.senate.gov/imo/media/doc/Perez%20SJQ%20Public%20Final1.pdf.
[14] *Id.* at 12.